So, Mr. Katzenbach, whenever you're ready, I don't want to rush you. When you're ready, you can proceed. Please state your appearance. Yes, Christopher W. Katzenbach. I'm appearing for the Appellants, the American Airlines Flow-Thru Pilots Coalition. And with the Court's permission, I'd like to reserve five minutes for rebuttal. This case is a duty of fair representation case under the Railway Labor Act and involves, at this point, an issue of causation and the application of what standard of causation should apply here, whether there should be an unusual standard of causation or whether we should have a normal standard of causation. I don't think that's a closed question. I think normal standards of causation apply just here as elsewhere. How would you define normal standard of causation? For causation, that would be the normal standard that we use. We also use substantial cause depending sort of on your state or your restatement or your prior decision. But all of them are cause and fact statements. I mean, in other words, is it a cause and fact of the event? You know, and it's like the phrase proximate cause, which, as the Court knows, you know, juries continually thought met a proximate cause. So it's an effort to try to get, you know, whatever words you use, but it's cause and fact. And cause and fact is, in our position, very simple. There was an agreement that discriminated against my clients. They didn't get the Doherty benefits because they were cut out from them. That's the cause. In fact, it's virtually the only cause of the fact that they didn't get the benefits. Before we get to that point, I mean, I agree with you that ACRI, ACLI causation standard, I forget what you call it, was a weird standard. That is a weird standard. But could we just reformulate it? What I think it's trying to get to is just proximate cause. Excuse me? What I think it's trying to get to, ACRI and ACLI, is just trying to get to is proximate cause. Yeah, I think that's actually a good point, and no one I've seen use that. I mean, I guess what they're trying to say is should there be some sort of more legal restriction on — Correct. A legally significant cause rather than just a but-for cause, as you would say. Well, I think the answer to that question arises really from the idea of the whole duty of fair representation. The duty of fair representation exists in order to protect minorities. I mean, there really is no purpose to it other than that. So therefore, when you have a proximate cause situation, the question you need to ask is, is the event that the employees are complaining about an injury because they — are they claiming an injury because they're sort of in a minority? And I think that that's — if that's the causation, that's proximate enough to the duty of fair representation. When you have — ACLI dealt with, I think, a slightly different problem, and where you — we try to do it, like, with formulas and other things, and I — but it really is dealing with what happens when you have bad behavior that doesn't directly affect you but might affect you. That really looks to me like they're using a sort of proximate cause. And in that sense, you know, you could easily argue that ACLI is trying to be a little more favorable to employees. In other words, saying, yeah, we know that what the union's misrepresentation or nondisclosure didn't actually cause you to lose anything, but there is a way it could have. So would you object if we reform — just said and said, ACLI, even though it uses this strange language, is just requiring a proximate cause? Yes, I don't think that would be an improper way of reformulating it. And then if that were the case, how do you survive? How do you win at that point? Oh, you know, I think you look at Staub, and you say they were — APA puts in motion a discriminatory agreement, whether AP — you know, then it — that is enough of proximate cause, but for a cause and proximate cause and legal cause, because after all, if you negotiate discriminatory terms, those are the legal cause of discriminatory benefits you didn't get. But, I mean, I guess the argument on the other side would be that no matter — even if we did discriminate against your clients, that they would not have received the loss of service credit anyway. So you couldn't survive either proximate cause or but-for cause. Well, that would be an argument they could make, but, Your Honor, you'd have to look at it in the context of discrimination. In other words, we're not talking about once you agree to benefits, you can't dole them out in a discriminatory way. In the Hirshhorn case in the Supreme Court, that was one of the passing arguments, probably one that the employer regretted making, was that, well, we didn't have to agree to this anyway. And the court said, no, once you've agreed to it, you can't dole it out discriminatorily. It's one thing to say you never agreed to give, you know, loss of service to anyone, but it's another thing to say you can dole it out discriminatorily. Well, I mean, they would say they are only, I mean, that your clients are not similarly situated because they've never been furloughed. Right. Well, but, Your Honor, as we point out in our brief, that's a factual issue for trial. And the reason... Was that under dispute? Yes. Because they are using... Your clients have been furloughed? They're using the term furlough in a sort of changing context. In other words, they're not using a word furlough that has a consistent and regular meaning. They're using the word furlough to cover up what they're doing. To be specific, what they're saying is, on the one hand, they're saying, like, the Stapleys were not furloughed pilots for purposes of Supplement CC. Loroco's arbitration hold they were new hire pilots, not furloughed pilots. So to turn around and say, well, yes, they're furloughed pilots, without ever saying what their term means as an operative term of why these are deserving of benefits, it simply becomes a label. And you can't simply say that we give benefits to people because they have this label we have given them, as opposed to something else. I mean, isn't it the traditional definition of furloughed employee means someone that's not working for you, even though, you know, and you have the right to recall them. So under that traditional definition, were the Stapleys working? No, they had no... Well, many of the Stapleys were flying for Eagle. Yes. So they were working. They were working. So they were not furloughed under, at least in the traditional word meaning. And there was no employer for them to go back to because TWA was no longer TWA. It was a, you know, it was, in fact, as you may recall, these were all an asset purchase. So there wasn't, there was not even a corporate entity at that point of any kind. There was, you know, it's one thing to be furloughed from a job and go back to your job. It's another thing when you're furloughed from a job and there's no job to go back, furlough is just a nice way of saying unemployed. So our position on this is then, you know, straightforward. And we think that while whatever confusion the language in ACLI and ACRI has created, it shouldn't detract from the fact that this case involves a straightforward application of discrimination against a minority group over years and years and years in a culture of hostility for them as job stealers and that where they have been put back and their wages have been cut and where, and I would just emphasize this, in an astonishing way their efforts to get answers to why are you doing this to us is met with just, is met with either total silence or in the end when they were complaining about seniority lists we can't talk to you because you sued us. I guess our feeling, our position is that if that is not a breach of the duty of fair representation, if that is not an abandonment of the interests of this pilot group, all of whom by the time all these events occurred had already transitioned to American Airlines and were flying at American from EGLE, that this is just a completely- Counselor, can I ask you a question? Certainly. So are you saying like in Demetrius that that was an ACRI-ACLI standard that was applied? Excuse me, I'm sorry, Your Honor, I didn't hear you as well as I should have. Are you saying that like in the Demetrius case, I think it's called Demetrius, that the ACRI-ACLI standard was applied in that case? I think ACRI, I don't, no, I don't think that was in that particular case. So, I mean, because it sounds like your response to Judge Bumate that you're saying that that's a form of ACRI-ACLI standard applied there. I'm trying to understand and reconcile because that seems like that was a discrimination case. Well, I think that what I was trying to respond to, Judge, I was trying to just say that in some ways ACRI, it would be not improper and a good way to look at ACRI-ACLI is looking at it as a proximate cause situation as opposed to a but-for cause situation. Although there are some elements there that I'm not particularly like because proximate cause is usually a subset of but-for. So, I think that, but I think the same, the idea of a legal cause is, I think, behind it. Yeah, because I don't think we've applied ACRI-ACLI in about 30 years and trying to figure out, you know, should we be applying like Beck, Addington, Demetrius, and then the Vaughn case out of New York seems to be very similar here. But I'm not sure, you know, it seems like that's what you argue in your briefs. I'm not sure if that's what you're arguing here today. No, I think what we're arguing is that when you have a direct causation from an discriminatory agreement, that satisfies any notion of but-for cause. And certainly the way but-for cause has been described at the Supreme Court and most recently in Vostok that, you know, the union by proposing and agreeing to a discriminatory contract caused the discrimination to go into effect and that that's sufficient for any form of causation, whether you call it but-for cause, proximate cause, or any other words, that that's enough. Just like in Staub, for example, in Proctor Hospital, the biased supervisor's biased report relied on by management was viewed as approximate and but-for cause of the ultimate discharge. Counsel, can I ask, why was the district court wrong to find as a factual matter that there is no way that American would have ever offered the LOS credit to your clients? I don't believe the district court's finding there is appropriate. I think that he was, I think with due respect to Judge Huber, I think just simply saying, well, could doesn't equal would doesn't answer the question, which is, which even under that standard would be, you know, is there, does the preponderance of the evidence show what happened? So the preponderance of evidence could show you could do it or you would do it. And that would be, but, but in this case, you would look. Wouldn't the center be here implausible? I get, it's 12B6 stage, right? Or no, this is not 12B6. Some judge, okay. So no. So it's certainly not totally implausible. They would, they gave it to everybody else. They, you know, they, the reason everyone else that was furloughed under the plain meaning of the word furlough. Every other pilot group used whatever term they want to use. They gave it. They never offered this as an explanation when, you know, we asked, they never said this is why we do it, or this is what the furlough thing, or even if they, it didn't redefine the term furlough in a way that we would be operative factually as opposed to just simply a label. It's like saying we, you know, in some ways it's like saying, you know, well, we gave, you know, we gave more money to Yale graduates and Harvard graduates. And, you know, we don't have a reason for that, you know, but we do. As a Yale graduate, I think there is. I was a Yale graduate. I would agree with that, of course, it's a general principle, but naturally other people, other people that I can think of might not. But I'm simply saying that that's an arbitrary, when you just give a label, it's arbitrary. Can I ask then, is there any evidence of American giving it the benefit to any other class that is furloughed under the traditional sense of the word furlough? No, the historical basis was that it only gave to American pilots furloughed from American. That was the historical situation. That those are the pilots, and those were given, and not even full LOS, that was given under letters CC and CC2. That's different, by the way, than supplement CC, just, you know, because, but no, there was no past practice of this and there was no involvement of our people in this, so that we basically, we're just operating against a blank wall generated by hostility. And I think that undermines all these explanations, as we point out briefly. But you argue, let me just ask you, you argue that, from my understanding, that even the most rigorous causation standard, the correct question is not whether American would have given the float-through pilots the seniority credits, but whether the and I just wanted to ask you, what is the outcome, and how did the union affect it? Union proposed the LOS credits, negotiated for them, company initially rejected it, then rejected it again, then rejected it again, and finally agreed upon it. You know, so they proposed their credits in the language that excluded the float-through pilots. That's how they caused it. Judge Baker, did you have any further questions? If, I don't want to take up time from your rebuttal, but I just, the, one thing that troubles me with your argument is why would there be a different causation standard under the statute, depending upon the type of claim? Oh, I mean, it seems to me that there's one statute with one duty, and the duty can be violated in various ways, and then accurately, it was misrepresentation to the members about the nature of the deal, but if there's one duty, why would there be different standards? I guess, you know, if our brief was confusing on that, I apologize. I don't think we're saying a different standard, we're just simply saying that ACRI-ACRI doesn't apply in a discrimination case, because the causation concerns are different, and one's direct and one isn't. I suppose if it's briefed that way, it's because that's the way everyone was talking about it, you know. All right. Thank you. Thank you, Chief. Thank you. I'll give you a few minutes for rebuttal. Thank you, Your Honor. Mr. Rosenthal, you may state your appearance. Thank you. Good morning, Your Honors. My name is Daniel Rosenthal for the Allied Pilots Association. Can you hear me okay? Thank you. May it please the Court. ACRI is the correct standard here, and Judge Bumate, it may seem like a weird or unusual standard, but in our view, it's simply our recognition of the fact that a union isn't the one who decides terms and conditions of employment, not on its own at least. It has a role of making proposals and negotiating. And so to hold that a union is responsible and caused a particular outcome, the plaintiffs have to show that the union's proposals actually would have affected the outcome. So in other words, if the union had made the proposal that plaintiffs want them to have made, would that have changed the outcome? Counsel, isn't that just another way of saying that you have to have the union's actions as of approximate cause to the loss of credits here? I think you could call it that. I have looked at it more as a question of but-for cause, but I don't quibble with the label so long as it recognizes the concept that the question is whether the company would have agreed to the proposal. Rosenthal, I guess I don't know. Has the Ninth Circuit already set tests for union discrimination type of claims? It seems like in Beck, we said that the test was, hold on just a second here. We said that the test was whether the discrimination was intentional, severe, and unrelated to legitimate union objectives. And so I'm just trying to figure out why would we add a causation test for the very first time, what it looks like to me for the very first time. Yeah, so thank you, Chief Judge. There is, in my view, a consistent approach to these cases in this circuit and other circuits of looking at it as a sort of two elements of a test. So first, the plaintiff has to show that there was a breach of the duty of fair representation, and that can be shown through discriminatory, bad faith, or arbitrary conduct. And that is, for example, what this, the element that this Court was looking at in Demetrius and Beck. But that alone is not, showing that the union breached the duty isn't the same as showing that that breach actually caused a harm to the plaintiff. And that's what basically in Ackley and Acri, this Court applied. Also, cases you mentioned such as Vaughn from the Second Circuit, Spellacy from the Second Circuit recognize there's a breach element and a causation element as sort of two separate elements. Your briefing doesn't cite any federal appellate cases which have applied the Ackley and Acri standard or causation standard in the context of the union's alleged discrimination and breach of this duty in representation. Instead, it seems that the standard only appears in union representation, misrepresentation cases. So I'm just trying to figure out if we would be departing from the United Circuit precedent and creating a circuit split if we applied Acri and Ackley as you propose. I certainly don't think so. So I think what you said, I would, I largely agree with that, but I would say in Bishop, for example, this Court affirmed in an unpublished affirmance a use of the Acri-Ackley standard in a DFR discrimination case very similar to this one. In Vaughn and Spellacy from the Second Circuit, I think even though the courts there didn't cite Ackley and Ackley, they applied basically the same rule and said because of the, sorry. But Spellacy was a misrepresentation case. And Vaughn, they just looked at whether, also, they just asked whether the plaintiffs were treated differently, not whether the employer would have done. So I'm just trying to figure out why we would impose that. My reading of Vaughn was that it said clearly that it was looking separately at a breach element and a causation element, and that on the causation element, because the plaintiffs there couldn't show that the company would have acted differently if the union had acted differently. Therefore, that claim was dismissed. So I do think the causation part of that holding is very similar, if not identical, to the test that we are asking for here. I think that it's, I mean, even if you totally put aside the precedent, just as a matter of first principles, if we're starting from scratch, if you're looking at but-for causation or approximate causation, regardless of how you want to look at it, the question is, if the breach hadn't occurred, if the union had acted the way that the plaintiffs say that it should have acted, would that have actually created, improved the situation of the plaintiffs? And here, the records simply show that it wouldn't have. The plaintiffs were not going to receive these credits, regardless of what APA did. And that does lead me, I want to get into the facts here and some of the questions that were asked to Mr. Katzbach about what it was that actually separated the recipients of these credits from the individuals who didn't receive the credits. So, the agreement provided a benefit to furloughed pilots, and we don't have to have an esoteric technical understanding of what that means. It's quite simple. Every single plaintiff who received this benefit is someone who was laid off, meaning that they were employed one day, and the next day, they were not employed. It's really that simple. So, every single recipient was in that situation. And that's not disputed. It's not disputed that the plaintiffs were never in that situation. What they complain about is that they were essentially waiting to be called up or promoted from American Eagle to American Airlines. So, they were delayed, essentially, in their promotion. And that's just simply a different thing than being laid off. And that's the distinction which is not disputed here. And I think what the plaintiffs are maybe quibbling with is that they are complaining that some of the recipients were laid off from an airline other than American Airlines, specifically an airline that was later merged into American Airlines, such as TWA or U.S. Airways. But let me ask you, were the state police really laid off? Didn't they fly for American Eagle? Well, basically, there was a contractual agreement that provided a right for pilots who are furloughed, generally, to what they call flow down and receive a position at American Eagle. And that was a right that some of the furloughees, actually a small portion, actually, were able to take advantage of. But I think that what's important here is that it doesn't change the fact that they were laid off. So, the fact that you may get another job, maybe after waiting quite a while, being unemployed for some period of time, doesn't change the fact that you were laid off. And it also means that, perhaps, if you are able to find another job, in this case, a bit less than you were paid before. So, you've had a lifestyle based on your salary as an American Airlines pilot. You get laid off, maybe you're on unemployment for six months, and then you get a job at Eagle at, let's say, half the salary. That is... Just to be clear, so every state police had been laid off at some point? Every... Yes, yes. Every single... I'm only hesitating because I'm trying to confirm that every state police actually received letter of G-credit. And I think they did. But what is, to be absolutely precise, every recipient of letter of G-credit was laid off. That makes sense. Period. And it's also worth noting that the group of pilots who weren't laid off, and therefore did not get this credit, is a very large group. Actually, it's the majority of the pilots at American Airlines. But I guess, I mean, the way I understood the dispute, you said it's undisputed, but it seems like the flow-through pilots are arguing that they weren't similarly situated as the state police, you know, for the reasons that you've been and I've been discussing. And so, it seems like that is in dispute. And typically, you know, whether people are similarly situated is a question for the jury. So, that's why I'm struggling with that. Yes. Well, I think that what the trial court found is that the situation of being laid off or furloughed is just starkly different from someone who isn't in that situation. And it's not just a matter of sort of opining on that. That's what the trial court thought. It's actually a matter also of looking at prior agreements at American Airlines, which have provided credit to pilots who are furloughed. Also, other agreements at other airlines within the industry, which provided this type of credit to pilots who are furloughed. And none of these other agreements at American and any other airline ever gave this type of credit to someone who was not laid off, like the plaintiffs. And so, the question for causation is, would American Airlines have agreed to basically do something that it had never done and that no other airline had ever done, which was extend this benefit for laid off pilots to pilots who are not laid off? And just to circle back, because I'm not sure if I wrapped up this point, I did want to say that this far exceeds the plaintiffs and their class. So, this is not a case in which they were singled out in any way. They're part of a very large group of pilots who are not laid off and therefore did not get the credit. And if they had been laid off, they would receive the credit. There's nothing in the agreement that says that this benefit doesn't apply to flow-through pilots. So, we think that the trial court correctly looked at the evidence that the plaintiffs put forward as kind of their offer of how they would attempt to prove causation, which took place after the plaintiffs actually stipulated in the joint pretrial statement to the very same kind of formulation of the causation test that we're advocating and asking the court to apply. The plaintiffs set forth the evidence that they wanted the court to consider on that element, and the court simply found that it didn't create a factual issue as to whether the company would have ever agreed to extend this benefit. Let me ask you, does the collective barter agreement state that a pilot must be furloughed by American Airlines to be considered furloughed? I thought it did. And so, weren't the staple ease furloughed from TWALC and therefore not furloughed within the meaning of the contract? Let me respond to that in two ways. So, first of all, what I think the collective bargaining agreement says in its definition of furloughs, it talks about being laid off from the company. And it defines the company as American Airlines. But at the time that TWA was purchased by American, it was actually owned by American and was operating as essentially part of the American Airlines system when these furloughs took place. So, even though technically it was a different entity, this was after this transaction had taken place and this company was being merged into American. Right, so the USA Pilots, my understanding, were furloughed from U.S. Airways long before the merger with American. Is that correct? There are recipients of letter G credit from U.S. Airways, which again was merged into American Airlines, who were laid off prior to the merger. Yes, that's right. So, doesn't that affect determining whether people were similarly situated based on their status? Well, I have to return to the point again that every single recipient was laid off, whether it was from American or from one of these other airlines that eventually sort of became part of American through a merger. Every single recipient was laid off and plaintiffs were not laid off, like the, you know, many other pilots who did not receive the credit. So, that's what we think is the core distinction. But laid off versus furloughed? Um, the reason either term, the reason I'm using the term laid off is because the plaintiffs have adopted this sort of very technical definition of what furloughed means, but. So, why did they get credits? Why did who get credit? The TWA pilots. Because they were furloughed. So, that group of recipients was working for TWA, they were laid off or furloughed. And then after the transaction with American, and then eventually were recalled. And that's when they received the credit. So, you're saying the U.S. Airways pilots are, it seems like, I'm just trying to remember, the U.S. Airways pilots were not laid off within the meaning of the collective bargaining agreement. Isn't that correct? I don't think that's correct. I think the plaintiffs have a, could I, I see my time's run out, but I could say another sentence or two. I think the plaintiffs have a technical, a very technical sort of esoteric argument for why they think that's correct. I don't think it's correct. But I think the core causation issue is whether American Airlines would have actually agreed to take a benefit that it viewed as belonging to this particular group of pilots who it disagreed with that, and then extend that benefit to a group of pilots, the plaintiffs, who were not laid off from any airline under any definition whatsoever. And that's how we see the issue. And I just had one more question I wanted to ask you. Because I think you're arguing that plaintiffs alleging union discrimination here must show the employer would acquiesce to their demands. But I'm just trying to figure out, wouldn't that defeat cases like Steele in which the Supreme Court recognized that the employer agreed to the union's discriminatory proposal? Well, Steele did not. I don't think Steele is inconsistent with our position in any way. Steele didn't analyze the causation issue. That case was decided, well, it was really the first duty of fair absentiation case that started this doctrine. And the doctrine has been, since then, developed and elaborated by this court and other courts. But in that opinion, what the court basically found, which is not something that is an issue in this case, is that a union can be found to have breached its duty of fair absentiation if it discriminates on the basis of race. And we don't disagree with that. But the question is, does the breach in this case cause the injury that plaintiffs are alleging? I don't know if Judge Fumate or Judge Baker, do you have any other questions? All right. Thank you. Thank you. And please, the court, a couple of just remarks. I'll give you two minutes. I'll make quick remarks. This unemployment explanation is not an explanation that APA ever gave, and it's not an explanation that the company ever gave in their declaration. So the second question is, unemployment from another airline is a strange basis for where my client should sacrifice benefits. In other words, if you look at bargaining as a zero-sum game or close to it, why should my clients take less money so that somebody who was laid off from another employer in another employment gets money, there's some of the money that my clients could otherwise have? Well, didn't American buy the other companies? Purchased the assets, but the problem, the state lease and TWA pilots couldn't move there because the American pilots took all the available job slots and didn't leave them any. You know, so they were out on the street or getting out. But in any event, unemployment's never been a factor, and it's not been... They don't say, for example, that people who were unemployed for years before they actually got hired as a new hire pilot at American got the money. This is not an explanation they gave. And again, it's an explanation that I think just mainly is an arbitrary distinction, which like saying that because you come from this school, you get more money than you come from that school. And it just labels. As to the word furlough, it is defined in the contract. It's been consistently defined as a layoff from the company. And the company means America, not anyone else. And in fact, in Supplement CC, which is the terms under which TWA pilots came to American, they continue that word company. The company is defined as American and not as the combination. So that, you know, I think the argument is at best, if they think that this is a furlough issue, that's a triable issue. In fact, and finally, as to the initial argument, I would direct the court to Straub and the cat's paw. The fact that the employer, the union may make a proposal knowing it's a discriminatory and knowing that the employer will then adopt it is exactly a cat's paw situation. And in those situations, the Supreme Court made clear, it's up to the defendant to show that the benefit would not have happened anyway. We've gone through it. Let me ask you a question regarding steel. If plaintiffs had to prove causation in the steel cases, as is argued by the pilots here, the allied pilots here, would the outcome have been different? Your Honor, if they had to prove that the employer would not have discriminated against black employees in Alabama in 1944, I think we not only know the answer intuitively, that was actually the basis of the Alabama Supreme Court's decision, that it was just fine to do that. And footnote 13 of our opening brief, we quote from that decision. So if they had to make that proof, that the employer would nevertheless have happily hired black employees at that job, they would have gotten nothing. I think the better case to look at in that one is the Richardson case in the Fifth Circuit, which the Supreme Court cited with approval in the Krozak case in a footnote, namely where they said basically it takes two to tango to get an agreement, and they're both responsible for the discrimination. That's actually been this court's position, I think in some of the cases we cited, that where a union and the employer both engage in discrimination, they're both responsible for the outcome. Thank you. Judge Bumatane, Judge Baker, do you have any final questions? Thank you, Your Honor, I appreciate the time. Thank you. Thank you both very much. We appreciate your arguments presented today. The case of American Airlines Float Through Pilots Coalition versus Allied Pilots Association is now submitted.
judges: MURGUIA, BUMATAY, Baker